Our final case of the day is Eaton v. J.H. Findorff & Son. Mr. Sultan. Good morning, Your Honor. Mr. Sultan, please proceed. Good morning. May it please the Court, my name is William Sultan and I represent the Apprentice with the International Union of Operating Engineers in Milwaukee. She was assigned to a job site working at J.H. Findorff & Son, Inc. in Milwaukee at a project that was called The Modern. During her very first assignment as a telehandler, Ms. Eaton was terminated after and on her very first day. The union filed a grievance during that time and the Eaton being permitted to work a skip hoist during the remainder of the project, at least that portion of the project. Mr. Sultan, I'm going to start you off. You don't have a lot of time. What is Ms. Eaton's best evidence that Ms. Murkowski knew that her 2012 complaint was based on discrimination? Can an inference of knowledge overcome testimony specifically denying that knowledge? What is implausible about his testimony that he believed it was simply a union grievance? Yes, Your Honor. I would point to the testimony in our reply brief from Mr. Simkowski, where he indicates that he was aware that in 2012, Ms. Eaton had complained about being laid off from the skip hoist that was the subject of her 2012 charge of discrimination with the U.S. Employment Opportunity Commission. He also indicated that he got that knowledge from either Mark Schneider or Sonny Femal. Sonny Femal is described by Mr. Schneider and others as Findorff's discrimination compliance officer. Findorff, on appeal and below, focuses like a laser on whether or not he was aware that an actual complaint was filed with an administrative agency, as opposed to whether he was generally aware that the subject matter of the complaint was based on sex discrimination. But does the record tell us, for instance, who at Findorff investigated and responded to the 2012 charge of discrimination? In other words, simply saying that the company was aware, it doesn't tell us about the knowledge of the decision makers. Yes, the best evidence in the record, Your Honor, comes from Mr. Schneider, who indicates that Sonny Femal investigates discrimination complaints, and those complaints would generally come to him as the general superintendent on projects. We know that Findorff's attorney submitted the position statement to the EEOC charge, not Ms. Femal or Mr. Schneider. The adverse decisions that were complained about in this case all occurred after J.H. Findorff responded to the complaints of discrimination. Well, see, I actually had a question very much like the ones Judge Rovner has asked. Looking at the 2012 grievance, it seems obvious to me that people can complain about all sorts of things. They can complain about job assignments. They can complain about boorish co-workers. They can complain about sex discrimination. They can complain about hours of work. I was on this shift or that shift. I don't know why we jump from the fact that a grievance was filed all the way over to the fact that not only it was a sex discrimination grievance, but that Ziemkowski knew that. Because if he didn't know it, then we jump ahead to 2018. He's the only person who even conceivably could have known it because the others didn't in 2018 and were left with nothing. Well, Your Honor, I want to be clear that Ms. Eaton did not file a union grievance in 2012. She filed a charge of discrimination with the EEOC. Mr. Ziemkowski describes that as a grievance. Certainly, Ms. Eaton could have filed a grievance with the union alleging sex discrimination. But merely because Mr. Ziemkowski in a deposition disclaims and denies knowing the subject matter, that is that it's a sex discrimination complaint, doesn't mean that a reasonable jury could not so conclude. It is clear from his testimony that he's to the layoff from the skip voice, which is the exact subject matter of the EEOC charge. And in order to respond to that charge fairly, one would have to speak with Mr. Ziemkowski, the person who made the layoff decision. I acknowledge that I don't have an admission in this case, but I don't think that that's necessary given the events that we're complaining about are subsequent to the charge of discrimination. I'd also like to point out that Ms. Eaton's appeal doesn't hinge solely on Mr. Ziemkowski. Mr. Schneider, we also submit that Mr. Schneider was aware of that complaint based on his similar testimony related to Sonny Fee Mall. Generally, he'd be the person who would be spoken with relating to discrimination complaints and specifically being aware that Ms. Eaton had in fact complained about being laid off from a skip voice and describing conversations with Ms. Eaton about the layoffs in 2012. But there's no question that Mr. Ziemkowski is the impetus behind denying and scuttling future job opportunities at Fyndorf for Ms. Eaton. And with the little bit of time I have left in my opening argument, I'd just like to point out that the 2017 job opportunity, that's a guaranteed job opportunity under the union contract. They don't select who's going to be operating the skip voice. They go to the union. The union identifies based on seniority and other factors who is entitled to that job. And there was nothing that prohibited her from that job until that 2017 conversation with Mr. Ziemkowski between Mr. Ziemkowski and Ms. Eaton. And I think that that is really important and central to her claim. If there aren't any further questions, I'll reserve the remainder of my time for rebuttal. Thank you, Mr. Sultan. Mr. Gentry. Good morning, your honors. May it please the court. I'm Michael Gentry. I'm here on behalf of J.H. Fyndorf and Son Incorporated. I'd like to begin by responding to the central discussion that Mr. Sultan had with your honors this morning. There simply is no evidence from which a reasonable fact finder could determine that Mr. Ziemkowski was aware that Ms. Eaton had actually filed a 2012 EEOC complaint in January 2012. When asked specifically by Mr. Ziemkowski, he denied the charge. He denied the knowledge. And also omitted by Mr. Sultan in his opening argument was that Mr. Ziemkowski also explicitly denied ever knowing that Ms. Eaton had ever alleged that her layoff in 2012 was related to her sex in any way. So we just don't we don't believe that there's any evidence in the record from which a jury could determine that. Pertaining to the position statement from the company that was filed in the case in 2012, that was that was completed by a lawyer. It was not myself. But it is in the record. It's at 16-7. It does not mention Mr. Ziemkowski. It does not mention Mr. Schneider whatsoever. So there's simply no ability for an inference to be made that either of them was consulted regarding the company's response. And furthermore, even if they were consulted, there's certainly no evidence in the record that that they were ever informed that the charge had been filed. For instance, they could have just. I would assume that a competent investigator would necessarily reveal the nature of the charge to the supervisor under investigation. Why isn't that sufficient to dispute Ziemkowski's denial of the nature of the charge? I mean, what company would answer a discrimination complaint without asking the person who made the decision whether his decision was based on sex? Well, first of all, your honor, I there's there's no evidence from Miss Sonny from all at all in the record. No, I've had no discovery was taken of her at all. Moreover, it certainly is plausible that the company was intentionally trying to keep Mr. Ziemkowski from being aware of the 2012 EEOC complaint, considering the fact that he was still working with Deborah Eaton for several months thereafter. In fact, she continued to work seven months after filing her EEOC complaint with the company until the position was eliminated. And there's no argument by Miss Eaton that, you know, the elimination of her position was in any way related to her sex. There's there Mr. Mr. Sultan discussed also that that there was some type of guarantee regarding the twenty eighteen job assignment. I'll just note for the for the record that there is no evidence that she ever filed that Miss Eaton ever filed a union agreements about that. So I'm not sure where that's coming from exactly. First of all, your honor, just briefly with regard to this twenty seventeen allegation, Miss Eaton applied for a job, submitted a job application. According to her, she she wasn't sure there was a job. So just in case this court's jurisprudence indicates that without a job to attain, there's simply no adverse action to support her failure to hire case. There's also there were two other individuals involved in the decision to not hire Miss Eaton in twenty eighteen besides just Mr. Schneider and Mr. Ziemkowski. They were Kim Norton, the field operations specialist that actually sent the letter to the union. And and Sam Garni, who was an administrative worker for the company who received the initial phone call from the union indicating that Miss Eaton was the one who was going to be sent. Miss Eaton does not contend that either of them knew about her twenty twelve charge at all. And that's important because, again, Miss Norton was the one who sent the letter informing the union not to send Miss Eaton to the job site. And there's simply no evidence in the record also that Mr. Ziemkowski had any influence on Miss Norton with regard to the letter, what went in the letter, or when it was sent. Moving on, your honors. Who did investigate the twenty twelve charge of discrimination? Your honor, that is not in the record. My understanding is that it likely was Sonny from all who was the safety director at the time. She no longer works for the company. Again, no discovery was taken of her in this case. Did she handle union grievances as well as charges of discrimination? I think with regard to union grievances, like, for instance, the 2011 grievance that Miss Eaton filed that Mr. Sultan described that was wholly unrelated to the twenty twelve EEOC case, she worked more so in tandem with Mark Schneider, who was the company's general superintendent. So did she handle both? Yeah. As far as I know, she had involvement in both, your honor. But again, the record does not clarify whether she did handle the investigation in the twenty twelve EEOC response. There was a different lawyer who represented the company at the time, and that lawyer wrote the response. So it could very well have been that the lawyer also did the investigation herself. With regard to the reasons for why the company did not hire Miss Eaton, there's undisputed evidence that Mr. Simkowski only told Miss Norton and Mr. Schneider in a discussion in April twenty eighteen that she was a subpar operator. And importantly, Miss Eaton concedes that she did, in fact, have the performance issues that Fendorf relies on and relied on deciding to not hire her. She wrote in her own handwritten notes that Mr. Simkowski had counseled her in January twenty, January twenty twelve about the speed at which she was running the skip hoist. And there were a lot of complaints from other workers on the job site. She also conceded that she failed at times and sometimes refused to pick up other workers in the skip hoist. In fact, that's one of the hallmarks of the issues that she had on the job site is that she had this confrontation in the skip hoist with another worker. And then she unilaterally decided that he would no longer be allowed to write the skip hoist without ever receiving any indication that she was allowed to make that decision. And she also concedes that at times she did not pick up the trash, which she was required to do. Miss Eaton, at most, is trying to create an issue of fact about whether the company's decisions was a good one. Well, she does. She does note, though, that Mr. Simkowski, at the same time as he being so critical of her, apparently, is submitting forms for the union that allow her to be promoted from apprentice to journeyman, which is a significant move in the world of unions. And so that could be seen as evidence that the criticisms weren't the real reason for their treatment of her, that, in fact, her performance was fine and it was something else. Well, first off, Your Honor, the on-the-job training cards that you're referring to, they are some evidence that the company marked her as average, as an average apprentice. They do not, as Miss Eaton contends, in any way indicate that she was meeting all of Fendor's expectations. But even though it was for promotion, I mean, unless you think that Mr. Simkowski just rubber-stamped things and advised unions to promote everybody, I don't know why the logical inference can't be that he was satisfied enough with her work that he was willing to certify for the union that promotion was appropriate. Your Honor, as with the knowledge or lack thereof of her 2012 EEOC case, I would cite the court to his deposition testimony where he was asked to explain why he rated her as average. And the undisputed testimony why he did that is that because she was standing right in front of him when she completed it and that he did not want to break her spirit. And furthermore, that she was a certain quota of Milwaukee County residents to employ in the job site. So he, in his own words, he tried to make it work for Milwaukee County residents. And that may not have been the best practice, Your Honor. But here, Miss Eaton needs evidence not only that it was not a good decision. Sorry, Your Honor, go ahead. No, no, no, go ahead. Oh, I'm sorry. Miss Eaton needs not only evidence that it was not a good business decision, she needs evidence that the performance issues were not the true reason for terminating her, I'm sorry, for not hiring her and that the true reason was this other 2012 EEOC complaint. Beyond the on-the-job training cards, Miss Eaton relies on this letter that was sent in April of 2018. And again, the only testimony in the record about why it was sent six years after the end of her employment was that that's when the union asked for it. And so there's certainly no evidence in the record to show that that delay of time was influenced by Mr. Simkowski, who is the person that she believes is sort of behind this whole thing, or that it's for any other reason for the nefarious purpose of retaliating against her. I thank you for your time, Your Honors. Thank you, Mr. Gentry. Anything further, Mr. Sultan? Yes, just briefly, Your Honor. I'd just like to address docket 16-7, which are a series of letter of correspondence related to Miss Eaton's charge of discrimination. Miss Eaton filed her charge of discrimination with the EEOC. It was cross-filed with the Wisconsin Equal Rights Division, which is the first letter in exhibit 16-7, which notes that it's being copied to the attorney. The second page is a letter from the respondent's attorney, which is indicating that it's being copied specifically to J.H. Findorf and Son. And then the third, or I should say the last page, which is page six, is a spreadsheet of actual time cards. And we know from Mr. Simkowski's the person who is making the time cards, the person who was making the decisions on playoff decisions, Mr. Simkowski, it's simply inconceivable that Mr. Simkowski or Mr. Schneider were unaware of Miss Eaton's charge of discrimination. Moreover, Miss Eaton was not the one who sent her charge discrimination to J.H. Findorf's attorney. And typically the EEOC sends it to the respondent first. The second thing I'd like to address that Mr. Gentry pointed out are the lack of adverse actions while she was on the job. It's not just the on-the-job training card that showed that her work performance was satisfactory, but Mr. Simkowski also testified that if work performance was poor, he would send a layoff slip. He did not do so when Miss Eaton was a skip voice operator. He did do so when she operated the telehandler, which is how we ended up with the 2011 grievance. So it's not just the on-the-job training card, it's the lack of any layoff slips, and it's also the lack of any adverse action letter like we saw in 2018 by Miss Gordon. And with that, I will yield the balance of my time. Thank you, counsel. The case is taken under advisement and the court will be in recess.